# CHARLESTON.

PRODUCERS COAL CO. v. MIFFLIN COAL MINING CO.

Submitted April 16, 1918.   Decided April 23, 1918.

1. CORPORATIONS—*Authority of General Manager—Contracts—"General Agent."*

   The general manager of a coal mining corporation is a general agent, and has implied authority to bind his principal by such contracts and modifications thereof as are reasonably necessary in conducting the business of mining and selling coal.  (p. 314).

2. PRINCIPAL AND AGENT—*Authority of General Agent—Question for Jury.*

   Where a general agent has such implied power to bind his principal it is error to submit to the jury the question of his authority.  (p. 314).

3. TRIAL—*Instructions—Consistency—Cure of Instructions.*

   Instructions should be consistent; a bad instruction is not cured by a good one; and the giving of conflicting instructions is generally presumed to prejudice the party complaining.  (p. 315).

4. CONTRACTS—*Consideration—Modification of Original Contract.*

   Where a controversy, whether of law or fact, arises between parties under an existing contract, and they adjust it by making a new contract, such new or modified contract is not without consideration, and it is not admissible to go behind it to ascertain which party was right in his contention.  (p. 317).

5. WITNESSES—*Credibility.*

   Where it is controverted whether or not an oral contract was actually made abrogating a pre-existing written one, and the testimony of interested witnesses on the point is conflicting, any fact or circumstance tending to show interest or motive in either making, or refusing to make such oral contract, is proper to go to the jury as affecting the credibility of such interested witnesses.  (p. 317).

Error to Circuit Court, Logan County.

Suit by the Producers Coal Company against the Mifflin Coal Mining Company.  Judgment for defendant, and plaintiff brings error.    *Reversed and remanded.*

*Wilkinson & Wilkinson, Headley, Wood & Sawyer,* and *French & Easley,* for plaintiff in error.

*Campbell, Brown & Davis,* and *Davis, Davis & Hall,* for defendant in error.

WILLIAMS, JUDGE:

Plaintiff, a coal selling company, sued defendant, a coal producing company, to recover damages for the breach of an alleged contract of sale to plaintiff of the output of defendant's coal mine for a year, beginning April 1, 1916, and ending April 1, 1917, at the net price of $1.00 per ton, run of mine. Defendant is successor in title to the Mifflin Coal Company, and took over its contracts and assumed its obligations on the 1st of January, 1916. At that time a written contract existed between plaintiff and defendant's predecessor, bearing date August 26, 1912, whereby the latter company employed the former as its sole sales agent to sell the entire output of its mine on the Coal River Branch of the Chesapeake & Ohio Railway, near the town of Clothier, for the period of four years and seven months, beginning September 1, 1912, and ending March 31, 1917, and in consideration of its selling and shipping the coal and guaranteeing the accounts, it was to pay it a commission of ten per cent. of the gross sums realized on all sales. That contract continued in force until April 1, 1916, when, as plaintiff contends, it was abrogated by the contract now sued on, which is also in writing and bears date April 26, 1916, and recites that it is confirmatory of an oral contract made in Huntington on the 13th of April, and is to take effect as of April 1st. It is signed by plaintiff company by D. H. Jenks its general manager, and by defendant company by Levi Deal its general manager. Defendant refused to furnish plaintiff any more coal under that contract after the 1st of November, 1916, and denied the authority of its general manager Deal to make the contract and claimed it was not bound thereby. On the trial of the case the jury found for defendant, and the court, after overruling plaintiff's motion to set aside the verdict, rendered a judgment of nil capiat and that plaintiff pay defendant its costs, and it prosecutes this writ of error.

Defendant's evidence presents two grounds of defense: First, that Deal, its general manager, had no authority to substitute the contract of April, 1916, for the one of August, 1912; and, second, that even if the contract made by Deal and Jenks was valid and binding on the defendant, it was thereafter itself abrogated and the original contract of 1912 restored to take effect on the 1st of November, 1916, by mutual agreement made on the 25th and 27th days of September, 1916, between said Jenks, acting for plaintiff, and M. E. Eakin, A. M. Christley and R. M. Cross, constituting a committee appointed by the directors of defendant company, with express authority to close down its mine if plaintiff should refuse to handle its coal on a basis of 10% commissions, according to the terms of the contract of 1912. That the parties named were duly appointed such committee at a special meeting of the board of directors, of which they themselves were members, by a resolution duly passed and entered upon the minutes, is fully proven and not denied. The agreement, if any was made at Huntington in September, was not reduced to writing, and plaintiff denies that any agreement was then made to reinstate the contract of 1912, and insists that the sale to it of the coal at $1.00 per ton, made in April, 1916, was a binding contract and continued in force. Eakin, Christley and Cross all swear positively that it was then agreed that, after November 1, 1916, and continuing until April 1, 1917, plaintiff was to sell defendant's coal on the open market, at the best prices obtainable, according to the terms of the original contract, and agreed to accompany its orders for shipments with a statement of the price it was getting, so that defendant might know it was receiving the market price for its coal. On the other hand, Jenks, the only witness for plaintiff on this point, although admitting the conference between himself and the aforesaid committee, held in Huntington at the Frederick Hotel on the dates above named, is just as positive in his denial that any agreement was then made. This was a fact which the jury had to determine. Plaintiff insists, however, that even if the jury believed the agreement which defend-

ant's evidence tends to prove was in fact made, it was not a binding contract for want of a consideration.

The first question is, did Deal have authority to bind his company by the contract of April, 1916? Defendant insists he had not, and that its directors never ratified the contract, because, it is contended, they first learned of its existence early in the following September, and the president shortly thereafter called them together for the purpose of taking some action concerning it, and also to provide some more satisfactory way of disposing of its coal. Deal himself was a director of defendant company, as well as its general manager, and had been since its organization. He was also a practical coal operator, and was interested in coal mines in Pennsylvania, where he and all the other directors resided, though not all in the same place. Deal employed a superintendent of the mine, put him in charge of its operation and did not visit the mine himself oftener than once a month, or perhaps not so often, during his term as general manager. Still, was it not a part of his duty as general manager to sell, or provide for selling the coal produced at the mine, and was not the contract which he made with plaintiff company within the scope of his duties? A corporation acts only by and through its officers and agents, and Deal was an agent of defendant, held out by it to the public, by virtue of his position, as representing it in the general management of its business, one important feature of which was the sale of the product of its coal mine. Coal producing companies do not store their coal, but usually sell it before it is mined and to be delivered at a future time, and sometimes on contracts covering long periods of time. Defendant took over a contract, made by its predecessor, which provided for the sale of all its coal to be produced during a period of four years and seven months. For three months next prior to April, 1916, defendant had received much less than $1.00, as the average price per ton, for its coal sold under the 1912 contract, and Deal no doubt thought, in view of the prices then prevailing in the market, that it would be more advantageous to his company to secure the net price of $1.00 per ton during the remainder of the period covered by the original contract

than to take the risk of getting much less. That he had the power, as defendant's general manager, to bind it by the new or modified contract, is borne out by the authorities.

The general manager of a corporation has authority to bind it by such contracts as are reasonably incident to the management of the business entrusted to him. It was, there-fore, not incumbent upon plaintiff to prove that Deal was expressly authorized to make the contract sued on, in order to hold the defendant liable. His apparent authority, as general manager of its business, to make the contract was sufficient ground to create liability. *Thomas and Moran* v. *Traction Co.*, 73 W. Va. 374; *Union Bank and Trust Co.* v. *Long Pole Lumber Co.*, 70 W. Va. 558; and *Lowance* v. *Johnson,* 75 W. Va. 784.

Plaintiff's instruction No. 1, which in effect told the jury that the contract of April, 1916, was binding on the defendant, and that, unless they believed from the evidence it was afterwards rescinded by mutual agreement, they should find for the plaintiff, was properly given. Counsel for plaintiff insist that the effect of this instruction was destroyed by the confusion produced in the minds of the jury by other instructions, given at the instance of defendant, inconsistent therewith. Defendant's instructions Nos. 3 and 4 are in direct conflict with plaintiff's No. 1, because they virtually tell the jury that Deal did not possess authority, by virtue of his position as defendant's general manager, to abrogate or modify the original contract; that he must have had express authority to do so, or have been held out by the directors of defendant company as having such authority, and that, unless they should find such express authority had been given, or that he was so held out as having such authority, the alleged contract of April, 1916, was not binding upon defendant, unless they should further find from the evidence that defendant subsequently and with full knowledge of its terms ratified it; that it is incumbent upon one dealing with an agent to ascertain the extent of his authority, and that, in entering into the contract with Deal, plaintiff did so at its own risk; and that the burden was on plaintiff to prove Deal's authority by a preponderance of the evidence. Conflicting instructions

which are calculated to confuse and mislead the jury should not be given. An erroneous instruction is presumed to be prejudicial to the party who complains of it, and a bad instruction is generally not cured by a good one. *Reese* v. *Wheeling & E. G. R. Co.*, 42 W. Va. 333; *Ward* v. *Ward*, 47 W. Va. 766; and *McKelvey* v. *C. & O. Ry.*, 35 W. Va. 500.

Defendant's No. 2 is also erroneous for the reason it likewise submitted to the jury the question of Deal's authority, and for the further reason that the principle of law therein stated relating to dealings between agent and principal, although correctly stated, is not applicable to the facts in this case. There is not the slightest evidence that Jenks concealed any material fact essential for defendant company to know, at the time it made the contract sued on. In so far as defendant's No. 5 submitted to the jury the question of Deal's authortiy it is also erroneous, but otherwise good. Its No. 6 was properly given.

There was no attempt on the part of plaintiff to prove the authority of Deal other than to prove the fact that he was defendant's general manager in charge of its business, which is not denied. Investing him with authority as its general manager is a sufficient holding out to the public as defendant's general agent clothed with authority to bind it by such contracts as were necessary to be made in the performance of his duties as such general manager. That was sufficient evidence of his power to bind his company by the contract sued on, under the cases above cited, and justified the giving of plaintiff's instruction No. 1. Defendant's instructions state correctly the law generally applicable to contracts made by special agents or agents with limited powers, but that rule does not apply to the general manager of a business, who is a general agent having implied power to make all kinds of contracts necessary to the successful conduct of the business. Eakin, Christley and Cross all testify that Deal was not authorized to make the contract, but the question is not one of fact but of law, to be determined by the court from the nature and extent of Deal's duties as defendant's general manager. It was, therefore, improper to submit to the jury the question whether Deal had authority to make the

contract. The contract being binding on defendant, the question whether it subsequently ratified it, was immaterial.

Plaintiff's right to recover, therefore, depends upon the controverted fact as to whether the April contract was abrogated by an oral one alleged to have been made in Huntington on the 25th and 27th of September, 1916. The testimony respecting this matter is very conflicting, and it is impossible for us to determine, in view of the conflicting instructions, whether the jury based their verdict upon the ground that the April contract was not binding on defendant for want of authority in Deal to make it, or upon the fact, which they may have found from the evidence, that the alleged oral agreement of September, 1916, abrogating the April contract and restoring the original one of 1912, was actually made.

It is insisted there was no consideration for the alleged oral contract of September, 1916. At that time there appears to have existed an honest difference of opinion between the parties respecting the April contract, defendant contending that Deal was not authorized to make it; that it cost more to produce the coal than it was getting for it under that contract; and that it had a right to shut down its mine and would do so rather than operate it at a loss. Whether it legally had such right it is unnecessary for us to decide. It thought it had, and we mention the fact only to show there was a bona fide contention between the parties respecting their rights, and, in order to settle them, defendant contends, the oral agreement was made, abrogating the April contract and restoring the original contract of August, 1912, with the modification thereof that plaintiff was to furnish, with each order for the shipment of coal, a statement of the price at which it was being sold in order that defendant might know it was receiving a fair market price for it. Plaintiff insists that this alleged modification is only a proper interpretation and not a modification of the contract, a question not material to the present inquiry. The settlement of these controverted matters, whether of law or of fact, was a sufficient consideration for the alleged oral contract, if it was in fact made. The compromise and settlement of doubtful questions, whether

of law or fact, arising out of the April contract, was a sufficient consideration for the oral contract of September; and it is not admissible to go back of the compromise or settlement in order to determine which was right in its contention. ''Where a compromise of a doubtful right is fairly made between parties, it is binding and cannot be affected by any subsequent investigation ,or result; and this is so, whether it is a compromise of a doubtful question of law or fact.'' *Korne* v. *Korne,* 30 W. Va. 1. *Kiler* v. *Wohletz,* 79 Kan. 716, L. R. A. (N. S.), 1915B, 11; *Skeate* v. *Beale,* 11 Ad. & El. 983, and cases cited in Notes III; *Moore and McClung* v. *Fitzwater,* 2 Rand. 442; and *Mills' Heirs* v. *Lee and Graham,* 6 T. B. Mon. (Ky.) 91.

The court refused to admit the proffered testimony of Jenks tending to prove that the profits made by his company on the coal handled during the seven months between April 1st and November 1st, 1916, under the new contract, was less than 7%, and this action of the court is assigned as error. That, we think, was a circumstance proper to go to·the jury. The evidence shows that, in the latter part of September, when the conference was held in Huntington, coal was selling in the market at $1.50 and $1.75 per ton, and the price advancing. If those prices should continue throughout the fall and winter seasons, or should advance, which then seemed very probable, plaintiff's profits would be much greater under the new contract than they would be under the old contract on a commission basis. It is less likely then that it would willingly agree to surrender the new contract and return to the old one in view of the encouraging condition of the coal market. The fact can have no direct bearing upon the main issue, still it is a circumstance bearing on the transaction which the jury could properly consider in determining the credibility of the witnesses whose testimony respecting the alleged oral agreement is so irreconcilable.

The court did not err in permitting defendant to prove that it had lost money during the time its coal had been handled by plaintiff under the April contract. This was likewise a circumstance which the jury had a right to consider in determining whether defendant was prompted by proper

motives in threatening to close its mine, if some other agreement were not made for selling its product. Whether it had a legal right to close down its mine for that reason we need not and do not say; but it was a matter which the jury had a right to consider in determining whether defendant was, acting in good faith in inducing plaintiff to enter into the oral agreement, if it did so.

The court properly refused to allow plaintiff to prove that defendant had made no effort to procure the attendance of Levi Deal, its general manager, as a witness, or to take his deposition. His absence was evident to the court and jury and did not need to be proven. If plaintiff wanted to use him as a witness it should have had him summoned; and if his testimony was material to the defense and defendant wished to avoid the effect of the legal presumption that, if he had testified, his testimony would have been adverse to it, it should have shown that it used proper diligence to have him present as a witness, or to take his deposition. Absence of a material witness for either party to a cause is not a cause of complaint by the other.

The judgment is reversed, the verdict set aside and the cause remanded for a new trial.

*Reversed and remanded.*